UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERZELLE WOODS,

                Plaintiff,

                                     Case No. 07-CV-15420

vs.                                 HON. GEORGE CARAM STEEH

WASHTENAW HILLS MANOR INC.,
d/b/a HEARTLAND HEALTHCARE CENTER-
ANN ARBOR AND HCR MANORCARE,

                Defendants.

_____/

ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANT'S MOTION TO DISMISS RACIAL DISCRIMINATION AND
HARASSMENT CLAIMS AND DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AS TO RETALIATION CLAIMS AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

      This employment discrimination lawsuit arises out of plaintiff Sherzelle Woods'

("Woods") termination as a certified nursing aid ("CNA") for an Ann Arbor nursing home

owned and operated by defendant Washtenaw Hills Manor Inc. d/b/a Heartland

Healthcare Center-Ann Arbor ("Heartland").  Woods alleges that she was discriminated

against and harassed because she is African American, and that she was terminated in

retaliation for her complaints of alleged racial discrimination and patient neglect.  Now

before the Court are three motions for summary judgment.  Heartland has filed a motion

for summary judgment of the racial discrimination and harassment claims and another

for summary judgment as to the retaliation claims.  Woods has filed a motion for partial

summary judgment for a finding of liability as to her Title VII claim of retaliatory

discharge.  A hearing was held on February 10, 2009.  For the reasons set forth below,

Heartland's motion for summary judgment as to the racial discrimination claims will be

denied but its motion for summary judgment as to the racial harassment claims will be

granted.  Heartland's motion for summary judgment and plaintiff's motion for partial

summary judgment with respect to the retaliation claims also shall be denied.

<u>BACKGROUND</u>

Woods began working at Heartland, a nursing home, on September 13, 2004 as

a CNA.  During her first years at Heartland she was a valued employee and earned an

award for employee of the month in March, 2005, and an award for employee of the

year in 2005, the same year that she was also nominated for a national award.

According to Heartland, Woods' problems began around March 29, 2006 when she was

disciplined for allegedly loud and offensive conduct.  (Doc. 66, Ex. Q).  Woods disputes

that she engaged in any misconduct and claims that the discipline was erroneous.

Woods claims that her problems began in early 2007, when she began to

complain of alleged racial discrimination and patient abuse.  Specifically, she told her

supervisors that patients were being left overnight in soiled bedding despite a policy for

the night shift to conduct bed checks every two hours.  (Doc. 56, Ex. 2 at 62-63).

Woods alleges that the nurses working the night shift were not disciplined because they

were white.  Woods claims that she made her complaints to her assigned nurses, to unit

manager Sheila Goodrich, to the director of nursing and abuse coordinator Renee

Hamilton, and to administrator John DeLuca, but that nothing was ever done to correct

alleged patient abuse or discrimination.  (<u>Id.</u>).

2

Heartland claims that Woods did not report the alleged abuse at the start of her shift, namely 7 a.m., but waited until 8 a.m. or later to report any alleged problems. Heartland alleges that in early 2007, there was a problem with CNAs punching into work at 7 a.m. but then sitting in the lounge for upwards of an hour before beginning their shifts.  (Doc. 66, Ex. D at ¶ 10, 11).  Based on this alleged problem, Goodrich states in her affidavit that she told nurse supervisors to "dog" the CNAs to make sure they started their shifts on time.  (Id. at ¶ 15-16).  In her affidavit, Goodrich also states that during a staff meeting, she told CNAs and nurse supervisors that when nurses tell  CNAs to jump, they should ask how high.  (Id.).  Woods has an entirely different version of Goodrich's comments.  She alleges that Goodrich told the nurse supervisors to "treat those bitches like the dogs that they are.  When you tell them to jump, they better say how high."  (Doc. 56, Ex. 2 at 27-28.)  Goodrich denies these allegations and denies ever making any racist remarks.  (Doc. 66, Ex. D at ¶ 17).  Woods alleges that Goodrich's comments were directed only to African American CNAs and not to white CNAs because only African American CNAs were at the meeting.  (Doc. 56, Ex. 2 at 38).

Woods also claims that Goodrich made derogatory comments about African Americans while discussing an anti-affirmative ballot proposal known as Proposal 2. According to Woods, Goodrich stated that she was glad that Proposal 2 had passed so that African Americans can stop thinking that they are better than everyone else and can get off their high horse.  She has submitted statements from two other African American employees who also complained about Goodrich's comments on Proposal 2. (Doc. 56, Ex. 24).

3

Woods also claims that African American employees were disciplined for conduct for which white employees were not, such as for medication errors.  She claims that when Weislo conducted an investigation into her claims of racial discrimination, he relied on selective disciplinary information provided by Hamilton and failed to consider records which showed a disparity in treatment between African Americans and whites. She also claims that she was disciplined for taking lunch with two other CNAs and leaving just two CNAs on the unit while white employees were not disciplined for the same conduct.

Woods alleges that she was disciplined in retaliation for her complaints of alleged racial discrimination and alleged patient abuse.  First, Woods claims that she was disciplined for showering a patient during the time that breakfast trays were being served.  This inservice occurred on December 21, 2006.  Second, she alleges that she was disciplined for leaving a patient alone in a restroom on February 5, 2007.  Third, at her deposition, Woods testified that her unit manager Sheila Goodrich was out to get her.  She alleges that Goodrich unattached the alarm off of one of her patients in an attempt to sabotage her.  (Doc. 56, Ex. 2 at 73).  At her deposition, Woods could not remember when this incident occurred but alleged that it happened after her report of alleged discrimination and alleged patient abuse.  (Doc. 56, Ex. 2 at 73-74).

She further alleges that she spoke to director of nursing and abuse coordinator Renee Hamilton in a two hour meeting in early 2007, the exact date of which she cannot remember, about the alleged discrimination by Goodrich.  (Doc. 56, Ex. 2 at 57-60). Woods claims that Hamilton dismissed her complaints, assured her that Goodrich was a good person, and suggested that Woods seek counseling or speak to her pastor.  (Doc.

4

56, Ex. 2 at 58).

In support of her claim of racial discrimination, Woods also relies on the deposition testimony of former nurse supervisor Horace Watkins who testified:

> [T]here was a great disparity between how they treated the black nurses and the white nurses, a great disparity between how they treated the black CNAs and the white CNAs.

(Doc. 56, Ex. 14 at 31). She also relies on African American CNA Kahlilah Wilson's deposition testimony that management treated African Americans differently than whites. (Doc. 56, Ex. 13 at 47).

In addition to Woods' claim that she made repeated oral complaints of alleged racial discrimination and patient abuses, she also made two written complaints. On February 21, 2007, she wrote to human resources. (Doc. 56, Ex. 3). In that letter, plaintiff stated that she was sending a copy to her attorney and appropriate agencies, although she never actually did so. (Id.). The letter complained of patients being left in soiled bedding and that her complaints to her supervisor Goodrich were being ignored, and she complained that she was selectively disciplined for taking lunch with two other CNAs, for leaving a patient unattended in a bathroom while she left to vomit, and for showering a resident during breakfast service. (Id.). She also complained that a white nurse was treated more favorably than an African American nurse regarding medication errors. (Id.). According to Weislo, he discussed the letter with Woods, Hamilton, and DeLuca on March 5, 2007 and advised Woods that they would investigate all of the allegations. (Doc. 66, Ex. H). Weislo also testified at his deposition that he gave the letter to Hamilton. (Doc. 56, Ex. 15 at 33).

In March, 2007, Hamilton had a meeting with CNAs regarding their new job duty

5

of checking vital signs.  During that meeting, Woods alleges that Hamilton singled her out and said that hypothetically I may not like Sherzelle but we all have to work together and if you don't like your job, you should quit before I fire you.  (Doc. 56, Ex. 2 at 131-32).  Woods claims this shows racially and retaliatory discriminatory animus.

On April 6, 2007, Woods handwrote another letter to human resources.  (Doc. 56, Ex. 4).  Much of that four-page single spaced letter addresses Woods' discontent with a new policy requiring CNA's to add taking patient vital signs.  (Id.).  The letter also states that on March 30, 2007, she brought to the attention of her nurse supervisor Goodrich a situation involving several patients left in soiled bedding overnight.  (Id.).  Woods complained that the midnight shift nurses were allowed to neglect their patients because they were white, not African Americans.  (Id.).  That letter closes by stating that she had sent a copy of the letter to her attorney and to the appropriate agencies but she did not actually do so.  (Id.).

The day after Woods drafted the April 6, 2007 letter, the circumstances giving rise to her termination took place.  On April 7, 2007, Woods placed a dirty meal tray on a cart containing fresh water.  Woods alleges that another African American CNA, Kahlilah Wilson, was placing the dirty trays on the cart with her.  (Doc. 56, Ex. 2 at 176).  An African American nurse supervisor, Dorothy Jackson, allegedly corrected Woods.  In her witness statement, Jackson states that she asked Woods if that was an acceptable practice and that Woods responded by telling her that we do this all the time.  (Doc. 66, Ex. K at 2.)  Jackson further states that Woods began complaining about her to other staff members that she should mind her own business.  (Id. at 3).  Woods alleges that Jackson loudly corrected her.  (Id. at 176).  The parties agree that Woods walked away

6

from Jackson.  Heartland alleges that Woods was insubordinate by ignoring Jackson.

(Doc. 66, Ex. K at 26).  Wilson testified at her deposition that they walked away from

Jackson because they wanted to avoid a confrontation.  (Doc. 56, Ex. 13 at 20).  The

parties dispute when Wilson appeared on the scene.  Woods alleges that Wilson was

there the entire time and participated in placing the dirty trays on the water cart.  (Doc.

56, Ex. 2 at 175-76).  Heartland, however, alleges that Wilson arrived at the scene later

as Jackson was correcting Woods.  (Doc. 66, Ex. K at 26-29).

On April 9 or 10, 2007,[1] the exact date being in dispute, Woods was called to the

management office to discuss the water incident with the head of human resources

manager, Dennis Weislo, and unit nurse manager, Darla Hamstreet.  According to

Wilson's deposition, she also met with Weislo about the incident on the same day.

(Doc. 56, Ex. 13 at 22-23).  According to Weislo's memo to file regarding the April 10,

2007 meeting, Woods was confrontational and aggressive but agreed to follow direction

from nurse supervisors and agreed not to mix dirty and clean food trays and water at

any time.  (Doc. 66, Ex. K at 6-7).  Woods complained that Jackson did not respect her.

(Id. at 7).  Woods alleges that no other CNAs were ever disciplined for mixing dirty trays

with clean water carts.

On April 16, 2007, Woods was asked to attend another meeting about the

watercart incident with Weislo and Hamstreet.  Heartland alleges that Woods was loud,

offensive, used profanities, pounded on the table and threatened administrators.

---

[1]According to Weislo's memo to file, the meeting took place on Tuesday, April 10, 2007.  (Doc. 66, Ex. K at 30-31).  But according to Woods' deposition, the meeting took place on April 9, 2007.  (Doc. 56, Ex. 2 at 180).

Woods denies these charges.  In the alternative, Woods claims that other employees were given lesser disciplines for the same alleged misconduct.  The decision to terminate Woods was made by the regional human resources manager Karen Szkutnik, after conducting an investigation into the April 16, 2007 meeting, along with divisional human resource manager Linda Neumann, and regional director of operations, Brenda Grove and in-house counsel.  (Doc. 66, Ex. K at 50).

After her termination, Woods filed complaints with the Michigan Department of Health ("MDOH") who found that the Healthcare facility was violating the law because the midnight shift was leaving residents in soiled bedding for extended periods of time. (Doc. 56, Ex. 7).

On July 13, 2007, Woods filed a five-count employment discrimination complaint in Washtenaw County Circuit Court and Heartland removed based on federal question jurisdiction.  Count I alleges racial harassment and discrimination in violation of the Elliott-Larson Civil Rights Act (ELCRA), MCL § 37.2101 et seq.  Count II alleges retaliation in violation of ELCRA.  Count III alleges racial harassment and discrimination in violation of Title VII.  Count IV alleges retaliation in violation of Title VII.  Count V alleges a violation of Michigan's Whistleblower Protection Act, MCL § 15.361 et seq.

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The

8

Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a

9

mere scintilla of evidence supporting the non-moving party.  <u>Anderson</u>, 477 U.S. at 248,

252.  Rather, there must be evidence on which a jury could reasonably find for the non-

movant.  <u>McLean</u>, 224 F.3d at 800 (citing <u>Anderson</u>, 477 U.S. at 252).

ANALYSIS

I.  <u>Defendant's motion for summary judgment as to racial discrimination claims.</u>

A.  <u>Woods has raised an issue of fact at to her prima facie case of racial discrimination.</u>

    To show her prima facie case of racial discrimination under ELCRA and Title VII,

Woods must show that she was (1) a member of a protected class, (2) subject to an

adverse employment action, (3) qualified for the position, and (4) for the same or similar

conduct, she was treated differently from similarly situated non-minority employees.

<u>Johnson v. University of Cincinnati</u>, 215 F.3d 561, 572-73 (6th Cir. 2000); <u>Perry v.</u>

<u>McGinnis</u>, 209 F.3d 597, 601 (6th Cir. 2000); <u>Hazle v. Ford Motor Co.</u>, 464 Mich. 456,

462 (2001).

    The adverse employment actions recognized by Heartland are (1) discipline for

an altercation on March 29, 2006, (2) discipline for leaving a patient alone in a restroom

on February 5, 2007, (3) a citation for repeated tardiness, and (4) discharge.   Woods

also seeks to rely on several "inservices" she received as alleged adverse employment

actions and her alleged discipline for placing dirty food trays on a clean water cart.

    1.  <u>March 29, 2006 Incident</u>

    Heartland alleges that Woods only claims racial discrimination taking place after

January, 2007; thus, her allegations of racial discrimination taking place in 2006 are

irrelevant.  Although the complaint does seem to limit her claim of racial discrimination

10

to acts occurring in 2007, the Court nevertheless considers those acts of alleged racial discrimination in 2006 as plaintiff's response to the motion for summary judgment makes clear that she is in fact also relying on 2006 conduct to support her claim.

Woods was disciplined arising out of a March 29, 2006 incident in which management claims she raised her voice at the nurses' station. Woods was given a Type B discipline for which she appealed and which was reduced, because it was her first offense, to a Minor Type C violation. Woods claims she was wrongly disciplined and that the incident arose after she complained that a white CNA, Kathy Madaski, had hit her with a breakfast tray three times. Heartland alleges that as soon as plaintiff filed an appeal of the discipline taken against her, it learned for the first time of her allegation that Madaski had hit her. Heartland alleges that it removed Madaski from plaintiff's unit once it learned of Woods' allegation. Woods, on the other hand, relies on the deposition testimony of white CNA Vickie Nolan who testified at her deposition that Madaski was not removed from the unit until Nolan filed complaints against her. (Doc. 56, Ex. 16 at 13-14). Nolan further testified that she apologized to Woods that Woods' complaints against Madaski were ignored, but hers were taken seriously because she was a "white female." (Id.). Based on Woods' and Nolan's deposition testimony, facts remain in dispute as to what took place during the March 29, 2006 incident and whether or not Woods' complaints about a white CNA were taken less seriously than similar complaints filed by a white CNA.

      2.    <u>February 5, 2007 Bathroom Incident</u>

On February 9, 2007, Woods was disciplined for leaving a patient alone in the bathroom who fell on February 5, 2007. Woods alleges that she left the patient

11

momentarily because she was violently ill and needed to run to the restroom herself. (Doc. 56, Ex. 2 at 45-47).  Renee Hamilton issued the discipline.  Hamilton is the same supervisor that hired Woods and recommended her for a national award in 2006. Heartland argues that under the "same actor inference" it is highly unlikely that Hamilton would suddenly decide to discriminate against Woods by giving her selective discipline. Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995).

Woods, on the other hand, argues that other CNAs merely received inservices for the same conduct.  In support of this allegation, Woods relies on her own affidavit in which she asserts that she personally reviewed documents obtained during discovery showing 39 instances of patients falling in the bathroom and that in none of those instances, did a CNA receive discipline.  (Doc. 56, Ex. 20).  It is unclear if any or all of those disciplines involved non-minorities.  Woods submitted for the Court's review only seven of those documents dated from October 20, 2005 until March 18, 2006 which show that CNAs were "educated" but not that any discipline was imposed.  (Doc. 56, Ex. 17).

Woods also relies on her deposition testimony where she testified that a white CNA left a patient unattended in the bathroom the very next day and received no discipline.  (Doc. 56, Ex. 2 at 45-46).  She also testified at her deposition that two days later the white director of nursing left a patient alone in the bathroom and received no discipline.  (Id. at 48-49).  Heartland responds that there is no written report from February, 2007 to substantiate Woods' claim that other falls occurred on her shift in the bathroom in the days after she was disciplined.  Heartland also responds that Woods has not shown that all of the falls involved white CNAs or that all of the falls occurred as

12

a result of a CNA leaving a resident unattended in the bathroom. Significantly, Heartland complains that none of the other falls involved a CNA who had already received four inservices for the same conduct. While Heartland's argument is persuasive, based on Woods' deposition testimony, declaration, and documents showing that other CNAs received education, not discipline, following patient falls, Woods has raised a genuine issue of material fact as to whether she was treated differently than non-minority CNAs regarding patient falls.

      3.    <u>Tardiness</u>

On February 9, 2007, Woods was issued a written citation for six occurrences of repeated tardiness. (Doc. 66, Ex. E). Each occurrence was based on four "tardies." (Doc. 66, Ex. S at ¶ 5). Woods alleges that her written citation for repeated tardiness was in retaliation for her complaints of racial discrimination and patient abuse, and that the "tardies" were based on a faulty time clock. (Doc. 56, Ex. 20 at ¶ 8-9). She also claims that she never received notice of the citation until this litigation ensued. (<u>Id.</u> at ¶ 9). She correctly points out that the citation is not signed by her or her supervisor although the written form contains a place for signatures to show that the citation was discussed with the employee. Heartland alleges that the citation was issued by the scheduler, Jamie Blackwell, who submitted an affidavit that he had no knowledge of Woods' complaints. (Doc. 66, Ex. S at ¶ 15-16). Woods has not refuted his assertion. Even viewed in the light most favorable to Woods, she has not raised a genuine issue of material fact that her attendance discipline was retaliatory or discriminatory as she simply cannot link the discipline to her race or her complaints. Heartland does not allege, however, that her attendance discipline was in any way related to her eventual

13

termination.

     4.    <u>Inservices</u>

The parties dispute whether Heartland's issuance of "inservices" to Woods for taking a lunch break in February, 2006 with two other CNAs, allegedly leaving the unit short staffed, and receiving another "inservice" for showering a resident in December, 2006, during breakfast tray pass, constitute adverse employment actions. An "inservice" is a form of training. In fact, CNAs need at least 12 hours of inservice per year to keep their licenses. There are general inservices for all CNAs and then there are specific inservices which are provided when a CNA breaks a rule. Once a CNA receives an "inservice" on a rule, the CNA may be subjected to discipline if the rule is later violated.

An inservice is not an adverse employment action. The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." <u>Policastro v. Northwest airlines, Inc.</u>, 297 F.3d 535, 539 (6th Cir. 2002) (citation omitted). Examples of an adverse employment action include termination, reduction in wage or salary, or significantly diminished responsibilities. <u>Ford v. Gen. Motors Corp.</u>, 305 F.3d 545, 553 (6th Cir. 2002). The Sixth Circuit has held that de minimus employment actions such as "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions," <u>Policastro</u>, 297 F.3d at 539. Here, the fact that Woods was given training based on alleged rule violations does not amount to an adverse employment action.

In her response to Heartland's motion for summary judgment, Woods alleges that

14

based on her race, she was singled out for showering a resident, who was in soiled bedding, during the time breakfast trays were to be distributed.  In support of her claim, Woods has attached a copy of the inservice given to her which states that while meal trays are being delivered, "under no circumstances is any one ever to take a break, go on lunch or to be doing cares, during this time.  This includes stepping off the unit for 5 minutes, or giving showers.  When trays come up to the unit we are to get meals to residents asap."  (Doc. 56, Exhibit 25).  Woods has submitted inservices given to other CNAs regarding how meal trays are to be delivered, and those inservices state that "CNAs must stop pt. care unless immediate care is needed."  (Doc. 56, Exhibit 26).  Woods argues that she should have been allowed to shower a resident during meal tray pass time, because immediate care was needed given the patient's soiled condition.  Even taking Wood's allegation as true, she has not shown that Heartland adversely altered the terms or conditions of her employment by cautioning her not to shower residents while breakfast trays are distributed.

     5.    <u>April 7, 2007 Water Cart Incident</u>

Woods alleges that she was disciplined for mixing dirty meal trays on the clean water cart while no other white CNAs were disciplined for the same conduct.  Heartland responds that it was an African American nurse Dorothy Jackson who corrected her for the misconduct, thus the discipline could hardly be racially motivated.  Jackson denied knowing of Woods' complaints of alleged patient abuse and racial discrimination, and in any event, no discipline was actually taken against Woods for mixing dirty trays with fresh water but rather, for her insubordination towards Jackson.  According to Woods' deposition, she was not insubordinate but walked away from the nurse to avoid a

conflict.  Since Woods was not actually disciplined for the April 7, 2007 incident, it cannot be an actionable adverse employment action.  That incident is, however, wrapped into her wrongful discharge claim as it was her alleged conduct at a meeting regarding her alleged insubordination to Jackson for which she was terminated.  Issues of fact exist as to whether Woods was in fact insubordinate to Jackson.  It is the testimony of Woods and that of her coworker Kahlilia Wilson, against the word of Jackson.

      6.   <u>Discharge</u>

Two disciplinary meetings followed the watercart incident.  The first was held on April 9 or 10, 2007, when Woods was called to talk with human resource manager Dennis Weislo and assistant director of nursing Darla Hamstreet.  (Doc. 56, Ex. 2 at 180).  The second meeting occurred on April 16, 2007.  Heartland alleges that Woods used loud and offensive words, pounded on the table, and threatened administrators during the disciplinary meeting held on April 16, 2007.  According to Heartland, the purpose of the April 16, 2007 meeting was to discipline Woods for insubordination to Jackson arising out of the watercart incident.  It is unclear why a second meeting was needed or why Woods was not disciplined during the earlier meeting.  At her deposition, Woods denied that she used loud and offensive words and CNA Wilson also testified that Woods did not use offensive words although she admitted that Woods raised her voice.

Woods also argues that even if she used loud and offensive words, other non-minority CNAs were disciplined less harshly than she was for the same conduct.  Specifically, she has submitted disciplinary notices given to two white CNAs.  One of

16

those was issued on October 7, 2007 and states that the disciplined CNA cursed loudly at a co-worker in the hall, yelled at a co-worker, made hostile and intimidating comments to coworkers, and attempted to make physical contact with a coworker in an intimidating way. (Doc. 56, Ex. 11). That disciplinary notice states that the employee had received a prior warning. For this conduct, the employee received a Minor Type C number 6 discipline which does not require termination. Similarly, Woods relies on a disciplinary notice given to another white CNA who was disciplined for "repeated reports of rude behavior towards co-workers." (Doc. 56, Ex. 12). That document left blank whether a previous warning had been given. For this misconduct, the CNA received a Minor Type C number 6 discipline. It is unclear if this discipline is really comparable to Woods' behavior as it does not state that any profanity or shouting was used, that the offensive language was directed at administrators, or that a prior warning had been given.

Woods also has submitted eleven other disciplinary notices to support her claim that she was disciplined more severely than non-minorities, although it is unclear if those notices all involved non-minority CNAs. (Doc. 56, Ex. 31). The information on these disciplinary notices is very limited and it is virtually impossible to determine from a review of them if those CNAs who were disciplined less harshly than Woods were really disciplined for the same conduct. One of the notices, however, does appear to be somewhat similar. In that disciplinary notice, Goodrich reported that "[inappropriate language in work area. Weekend manager requested one CENA [CNA] to go to another unit where needed CENA [CNA] stated "This is Bullshit!" (Doc. 56, Ex. 31). That document appears to be somewhat remote in time as it is dated April 16, 2003, but

17

it is signed by the same supervisor, Goodrich.  For this conduct, the CNA was given a Type C Rule 7 violation.  This disciplinary notice states that the CNA was given a previous warning.  Another notice states, "a verbal comment was made that could be construed as a threat."  For this conduct, a CNA was given a Type C number 14 violation.  For that violation, it was noted that it was a first offense.  In that regard, the discipline would not be comparable to Woods' termination as she was previously disciplined for raising her voice at a nurse's station on March 29, 2006.  However, Woods disputes that the March 29, 2006 discipline was valid and claims that it was also discriminatory.

The other disciplinary notices are somewhat vague as to the conduct at issue, stating general comments such as "maintain acceptable standards of respect for and courtesy to residents/pts visitors co-workers & supervisor," "you were observed & overheard to be disrespectful and rude to another employee," "you exhibited disrespectful behavior," "CNAs kept talking loud," "you exhibited disrespectful behavior," "you exhibited contrary behavior to a resident," and "arguing with the nurses or trying to get them to change assignments is also not acceptable."  (Doc. 56, Ex. 31).  For the above conduct, the CNAs received Minor C disciplines or inservices.  (Id.).
Woods argues that the white CNAs were disciplined much less harshly than her as she was automatically terminated for what she alleges is comparable conduct.  Heartland argues that none of the disciplines given to the white CNAs are comparable as they all involved a first offense.  This is not borne out by the facts.  Three of the disciplinary notices Woods attached identify that previous warning(s) had been issued. (Doc. 56, Ex. 31, Ex. 11).

18

Heartland also argues that all of the discipline notices that Woods relies on were given by Stephanie Marcotullio, a different supervisor than the individuals involved in Woods' termination.  (Doc. 68, Ex. I at 224).  Where there is a different decision maker, Heartland argues that the disciplines are not "similarly situated."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (citing Mitchell v. Toledo Hosp., 964 F.3d 577, 583 (6th Cir. 1992)).  This Court has carefully reviewed the disciplinary notices submitted by Woods and finds that several of them were signed by Woods' supervisor, Goodrich.  (Doc. 56, Ex. 11, 31).  Heartland argues that Goodrich was not the decision maker who terminated Woods, but the management official who determined to terminate Woods, Karen Szkutnik, spoke with Goodrich and considered her witness statement as part of her investigation.  (Doc. 68, Ex. K at 50).  Although it is very difficult to access whether the white nurses were disciplined for comparable conduct, through these disciplinary notices, Woods has raised a question of fact as to whether white CNAs were treated more favorably than her for the same alleged misconduct.

In sum, Woods has come forward with sufficient evidence to create a genuine issue of material fact as to her prima facie case of alleged racial discrimination.  She has raised an issue of fact based on allegedly selective discipline involving the March 29, 2006 incident and the February 5, 2007 bathroom incident.  She also has raised an issue of fact as to whether her conduct warranted discharge or whether non-minorities were treated less harshly for the same alleged misconduct.

19

B.     Plaintiff has raised an issue of fact as to whether defendant's stated reason for her discharge is pretexual.

Heartland argues that even if Woods can establish her prima facie case, it is entitled to summary judgment because it has shown a legitimate nondiscriminatory reason for her termination, namely, her conduct at her April 16, 2007 disciplinary hearing.  Under Title VII, once the defendant comes forward with a nondiscriminatory reason for the termination, the burden shifts to Woods to prove that Heartland's stated reasons are actually a pretext for unlawful discrimination.  Johnson, 215 F.3d at 573.  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown to both that the reason was false and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  Under ELCRA, Woods must prove that Heartland's reason for the termination is false and that her termination decision was actually motivated by discrimination.  Hazle v. Ford Motor Co., 464  Mich. 456, 465 (2001).

Heartland asserts that it terminated Woods because at the April 16, 2007 meeting, she used loud offensive language, and pounded on the table in a threatening manner.  In support of this argument, Heartland has submitted statements by six witnesses and from administrators Dennis Weislo and John DeLuca.  (Doc. 68, Ex. K). All six witnesses and Weislo and DeLuca gave statements that they heard Woods using a loud voice or yelling.  (Id.).  Weislo, DeLuca, Hamilton, and Destine Adams further stated that they heard Woods use profanities.  (Id. at 33, 36, 40, 43).  Specifically, Weislo stated that Woods said, "I am fucking sick of this bullcrap."  (Id. at 33).  Adams stated that Woods said, "Everyday I'm in this office for some bullshit."  (Id. at 40).

20

Kahlila Wilson's witness statement says that during the meeting Woods "kept getting madder, lot of frustration, she kept getting louder." (Id. at 52). Later, however, when the termination was on appeal Wilson submitted a statement that "[d]uring this meeting Sherzelle Woods never used profanity, she did not raised [sic] her voice. Lastly she never pounded on the table." (Doc. 68, Ex. Z). At her deposition, Wilson testified as follows:

> Q.   And Ms. Woods never pounded on the table?
>
> A.   She might have like hit the table like that, but not like pounded. Like, you know, you hit the table like you're trying to make a point like quiet down, I'm trying to say something but you guys are talking over me so I can't get a point across.
>
> Q.   Did she ever threaten anybody?
>
> A.   No.

(Doc. 56, Ex. 13 at 36). At her deposition, Woods claimed that she never raised her voice because she was crying too hard and that she never used profanities, although she admits that she said "bullcrap." (Doc. 56, Ex. 2 at 184, 188). It appears that it is plaintiff's story with some limited corroboration by Wilson, versus the statements of eight persons that she was either yelling or loud during the meeting, and the statements of four witnesses that she used profanity. The Court is prohibited from making credibility determinations in deciding a motion for summary judgment, but must instead view the record in the light most favorable to the non-movant. See Ahlers v. Schebil, 188 F.3d 365, 369 (6th Cir. 1999). Woods has raised a genuine issue of material fact as to whether her termination was for a legitimate reason or whether Heartland's stated reason is merely pretext for discrimination.

21

In reaching this conclusion, the Court has considered the other alleged direct evidence of discrimination which Woods has presented.  Woods relies on the testimony of former nurse supervisor Horace Watkins that he saw a great disparity between how African American CNAs and white CNAs were treated.  (Doc. 56, Ex. 14 at 31).  She also relies on Wilson's testimony that African American CNAs were disciplined more harshly than whites.  (Doc. 56, Ex. 13 at 47-51).  Former white CNA Nolan also testified that management treated white employees and patients better than African American patients and employees.  (Doc. 56, Ex. 16 at 59-66).

Woods also claims that Sharon Goodrich made two racist comments.  First, she alleges that Goodrich told nurse supervisors that when overseeing African American CNAs, they should "treat those bitches like the dogs that they are."  (Doc. 56, Ex. 2 at 27-28).  Goodrich denies that she called CNAs "bitches," and claims that any statement she made that nurse supervisors should "dog" CNAs referred to all CNAs not just African American CNAs.  (Doc. 66, Ex. D at ¶ 17).  Moreover, Heartland alleges that Goodrich made the statement to African American nurse supervisors and thus, the statement could not be racist.  The Court agrees with Heartland that this is a "stray" comment, unconnected to any alleged discrimination, and does not support Woods' discrimination claim.  Garg v. Macomb County Cmty. Mental Health Servs., 472 Mich. 263, 289 (2005).

The second comment attributed to Goodrich presents a closer question.  Woods alleges that Goodrich said that she was glad Michigan's anti-affirmative action law, known as Proposal 2, had passed so that African Americans would be treated equally and could get "off their high horse."  (Doc. 56, Ex. 2 at 41).  Goodrich denies making

22

any racist statements.  (Doc. 66, Ex. D at ¶ 17).  Having carefully considered all of the

evidence presented, Woods has presented a question of fact as to whether her

termination was warranted for loud and offensive conduct, or whether her discharge

was discriminatory.  Woods' own deposition testimony that she did not raise her voice,

did not use any profanity, and did not threaten anyone at the April 16, 2007 meeting,

while disputed by many witnesses, raises an issue of fact as to what actually occurred

at the meeting for which she was discharged.

II.    Defendant's motion for summary judgment of racial harassment claims.

Plaintiff also alleges racial harassment.  To establish a prima facie case of racial

harassment under Title VII, plaintiff must show: (1) she was a member of a protected

class, (2) was subjected to unwelcome racial harassment, (3) the harassment was

based on race,  (4) the harassment had the effect of unreasonably interfering with her

work performance by creating an intimidating, hostile or offensive work environment,

and (5) the employer knew or should have known of the harassing conduct but failed to

take corrective or preventive action.  Bailey v. USF Holland, Inc., 526 F.3d 880, 885 (6th

Cir. 2008) (citing Michael v. Caterpillar Fin. Svs. Corp., 496 F.3d 584, 600 (6th Cir.

2007), cert. denied, 128 S. Ct. 1657 (2008)).  The standard is the same under Michigan

law.  Quinto v. Cross & Peters Co., 451 Mich. 358, 368-69 (1996).  To establish the

fourth element, Woods must show "that the alleged conduct constituted an

unreasonably abusive or offensive work-related environment or adversely affected the

employee's ability to do his or her job."  Bailey , 526 F.3d at 886 (quoting Moore v.

KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1079 (6th Cir. 1999)).  Harassing

conduct must be extreme.  "[S]imple teasing, offhand comments, and isolated incidents

23

(unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Hafford v. Seidner, 183 F.3d 506, 512-13 (6th Cir. 1999). The harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The test has both an objective and subjective element: the harassment must be so severe that a reasonable person would find it hostile or abusive and the victim herself must regard the environment as hostile. Id. at 21-22. Woods' claim fails under the objective standard.

Heartland argues that Woods' claim is similar to the situation presented in Broska v. Henderson, No. 01-4013, 2003 WL 21518733 (6th Cir. June 30, 2003) where the plaintiff complained that his supervisors continually monitored him and subjected his work to criticism. The Sixth Circuit ruled that it was the job of plaintiff's supervisors to manually inspect his work and the plaintiff failed to show that his supervisors physically intimidated him, subjected him to verbal abuse, or bothered him away from his work or breaks. Id. The Sixth Circuit found that plaintiff's allegation amounted to minor annoyance not severe or pervasive harassment. Id. The Court distinguished the case from its earlier decisions where it in fact found that racial harassment existed. See Allen v. Michigan Dep't of Corr., 165 F.3d 405 (6th Cir. 1999) (harassment where plaintiff was subjected to racial epithets and insults by supervisors, received a threatening note signed by the KKK, and had his lock cut off his locker); Moore, 171 F.3d at 1073 (harassment where employer subjected plaintiff to unwarranted disciplinary proceedings and had him ostracized by all other working personnel including the janitor who was instructed not to clean his area); Morris v. Oldham Cty. Fiscal Court, 201 F.3d 793 (6th

24

Cir. 2000) (sexual harassment where supervisor followed plaintiff home and gave her the finger, destroyed her television, and threw nails on her driveway on several occasions).

Woods claims that the harassment in this case was frequent, severe, humiliating and unreasonably interfered with her work performance and put her patients at risk.  In support of her racial harassment claim, Woods relies on the following allegations: Goodrich allegedly removed a patient's alarm to set her up for discipline, management called Woods into the office on a daily basis, Goodrich allegedly referred to African American CNAs as "bitches" who need to be treated like "the dogs that they are," Goodrich allegedly told a group of minority employees that she was glad affirmative action was over so that "blacks can get off their high horse," and she was subjected to unwarranted disciplines and inservices based on her race.

Heartland argues that Woods cannot show racial harassment because Goodrich's allegedly racist statements were not made to Woods and are unrelated to any adverse employment action.  Heartland further claims that any allegation that Goodrich tried to "set her up" for discipline by removing a patient's alarm is irrelevant as Woods was never disciplined for leaving a resident off their alarm.  Goodrich submitted an affidavit that she never detached an alarm of one of Woods' patients to set her up for discipline.  (Doc. 66, Ex. D at ¶ 38).  Heartland disputes that Woods was called into "management's office" on a daily basis and further states that Woods cannot show how any of these "managers" were involved in the decision to terminate her.

In this case, Woods has not shown severe or pervasive racial harassment.  The only discipline that Woods has alleged is that she was wrongfully disciplined for leaving

25

a resident alone in a bathroom.  Although the Court has found that the discipline arising

out of the bathroom incident may create an issue of fact with regard to her racial

discrimination claim, it is insufficient to support her harassment claim.  The only

discipline that she received for leaving the patient alone in the bathroom was written a

citation.  She suffered no loss of salary, no reduction in job responsibilities, no transfer

to a less desirable shift.  She also claims she was singled out for taking a lunch break

and leaving her unit shortstaffed, and for showering a resident during breakfast pass,

but she has not shown that these two minor corrections, for which she received

inservices, not discipline, created a hostile environment.  Although Woods has raised an

issue of fact as to whether her discharge was discriminatory, the discharge itself, even if

discriminatory, cannot support her harassment claim as it was a discrete event.  Woods

has failed to meet the severe or pervasive harassment standard.  Taking all of her

allegations as true, an objective person would not find that Heartland altered the

conditions of her employment and created an abusive working environment.

Accordingly, Heartland is entitled to summary judgment on Woods' racial harassment

claims.

III.    Defendant's motion for summary judgment as to retaliation claims

A.    Plaintiff has raised an issue of fact as to causation.

Woods alleges that she was terminated in retaliation for complaining about

alleged racial discrimination and alleged patient neglect under the Michigan

Whistleblower's Protection Act (WPA), MCL 15.362; the Elliot Larsen Civil Rights Act

("ELCRA"), MCL § 37.2701(a), and Title VII, 42 U.S.C. § 2000e-3(a).  The standards of

law are similar under all three statutes.  The WPA provides, in relevant part:

26

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

MCL § 15.262.  To state a claim for retaliation under the WPA, the plaintiff must show that (1) the plaintiff was engaged in a protected activity under the Act; (2) the plaintiff was discharged or discriminated against; and (3) a causal connection exists between the protected activity and the discharge.  Chandler v. Dowell Schulumberger, Inc., 456 Mich. 395, 399 (1998).  To prove causation under the third-prong of the analysis, a plaintiff must show more than mere coincidence in time between the protected activity and the adverse employment action.  West v. General Motors Corp., 469 Mich. 177, 186 (2003).  Summary judgment is warranted for the defendant where the plaintiff cannot show a causal link between the protected activity and the adverse employment action. Id. at 188.

Similarly to the WPA, to prove retaliation under ELCRA, a plaintiff must show (1) that he engaged in a protected activity; (2) that his was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that the opposition or participation was a significant factor in an adverse employment decision. Polk v. Yellow Freight Sys., Inc., 801 F.2d 190, 199 (6th Cir. 1986).  According to Polk, the "significant factor" standard "requires a showing of more than a 'causal link.'" Id. at 199.  The Title VII standard is similar to the ELCRA standard.  To prove a claim of

27

retaliation under Title VII, plaintiff must show (1) the plaintiff was engaged in protected activity; (2) an adverse employment action; (3) a causal link between the protected activity and the adverse employment action.  Johnson v. United States Dep't of Health & Human Servs., 30 F.3d 45, 47 (6th Cir. 1997).  The Title VII test requires a "causal link" but does not require a showing that the participation in the protected conduct was a "significant factor" in the alleged adverse employment action.

There is no dispute that Woods engaged in protected activity and was discharged.  The only question is whether Woods can show a causal connection between her complaints of alleged discrimination and patient abuse and her termination. Woods asserts that she has shown a causal connection based on the close proximity in time of her termination and her complaints, because she was selectively disciplined for conduct for which other CNAs were not, that Hamilton threatened to terminate her, that Goodrich allegedly removed an alarm from one of her patients in an attempt to sabotage her, and that her nurse supervisor Phyllis Maxfield told her that she could not report patient abuse to Sheila Goodrich and Renee Hamilton because they would be "pissed."  (Doc. 56, Ex. 2 at 29).  Heartland alleges that Woods cannot show any causal connection between her termination and her complaints of alleged racial discrimination and patient abuse and that it had a legitimate nondiscriminatory reason for firing her based on her insubordinate conduct at the April 16, 2007 meeting where she allegedly shouted profanities at administrators and pounded on the table in a threatening manner.

1.   Temporal Proximity

The Court first considers Woods claim that she can show a nexus between her termination and her complaints of alleged discrimination based on the closeness in time

28

between her complaints and her discharge.  She alleges that she began making oral

complaints to her supervisors in early January, 2007.  She wrote two letters to human

resources complaining of alleged racial harassment and patient abuse, one on February

21, 2007, and the other on April 6, 2007.  Woods was discharged on April 20, 2007.

Thus, Woods was fired four months after she first began her complaints, two months

after her first written complaint, and approximately two weeks after her second written

complaint.

As to her WPA and ELCRA claims, the Michigan Supreme Court has held that

the fact that an employee suffers an adverse employment action after engaging in

protected conduct, standing alone, is insufficient to demonstrate a causal connection.

West, 469 Mich. at 186.  The Supreme Court explained, "[s]omething more that a

temporal connection between protected conduct and an adverse employment action is

required to show causation."  Id.  In West, a case relied upon by the defendant, the

plaintiff was a General Motors maintenance supervisor who was discharged for

allegedly falsifying his time sheets to recover overtime hours that he did not actually

work.  469 Mich. at 178.  Plaintiff alleged that the charges against him were

manufactured in retaliation for his report to the police of an alleged assault by a union

committee person.  Id. at 182.  He filed a claim under Michigan's WPA alleging that his

employer retaliated against him by falsely accusing him of time sheet violation,

transferring him to a different shift, and terminating him.  Id.  The Court of Appeals found

a factual question existed as to whether there was a causal connection between the call

to the police and the subsequent adverse employment actions.  Id.  The Supreme Court

reversed finding that the coincidence in time between the protected activity and the

29

adverse employment action was an insufficient basis to prove causation.  Id. at 186.

The Court explained, "[s]omething more than a temporal connection between protected

conduct and an adverse employment action is required to show causation where

discrimination-based retaliation is claimed."  Id. (citing Nguyen v. City of Cleveland, 229

F.3d 559 (6th Cir. 2000)). The only other evidence the plaintiff introduced was his

testimony that his supervisor was "nonchalant" when told of the police report.  Id. at 186.

The Court found that since the supervisors were not upset by the police report and

furthermore, the supervisors at the time of the assault were not involved in the decision

to terminate him, plaintiff failed to show a causal connection between his discharge and

his protected activity.  Id. at 187.

Woods argues that West's reliance on Nguyen for the proposition that temporal

proximity standing alone cannot establish a causal connection is no longer good law

based on the Sixth Circuit's recent opinion in Mickey v. Zeidler Tool & Die Co., 516 F.3d

516 (6th Cir. 2008).  Indeed, in Mickey the Sixth Circuit revisited the question of whether

temporal proximity between protected conduct and an adverse employment action can

ever be enough, standing alone, to infer a causal connection.  In Mickey, a general

manager of a tool and die shop, with thirty-three years of experience, filed an EEOC

complaint alleging age discrimination based on a reduction in his salary and benefits.

Id. at 519-20.  On the day that his employer learned of his EEOC complaint, he

terminated Mickey.  Based on this circumstance where the employer fired an employee

immediately after learning of his protected activity, the Sixth Circuit ruled that it "can

infer a causal connection between the two actions, even if Mickey had not presented

other evidence of retaliation."  Id. at 525.  Although the Sixth Circuit ruled that the close

30

nexus between his termination and the EEOC complaint was enough to show a causal connection for Mickey's retaliation claim, the Sixth Circuit went on to rule that other circumstantial evidence supported his claim including his reduction in salary and benefits in 2004 and his employer's repeated questions regarding his retirement plans. Id. at 526.

This case is distinguishable from the facts of Mickey where the employee was immediately fired as soon as his employer learned of his EEOC complaint.  In this case, plaintiff's complaints had lasted for upwards of four months.  Although the termination was only about two weeks after plaintiff's April 6, 2007 letter to human resources, she had sent a similar letter two months earlier, on February 21, 2007.  Under these circumstances, unlike Mickey, the time elapsed between her complaints of racial harassment and patient abuse and her discharge are too remote in time to establish a causal connection absent corroborating evidence.  The Court may draw an inference of causation based on the temporal proximity, but it is only an inference and without more, does not show causation.  Although there is some tension in Sixth Circuit law as to whether proximity between protected conduct and adverse employment action is sufficient to prove causation, the law is well established that more than a few months is insufficient, standing alone, to establish causation.  Hamilton v. Starcom Mediavest Group, 522 F.3d 623, 629 (6th Cir. 2008) (nine months too long), Arendale v. City of Memphis, 519 F.3d 587, 606 (6th Cir. 2008) (two months too long).  But see Hamilton v. General Elec. Co., __ F.3d __, No. 08-5023, 2009 WL 331260 (6th Cir. Feb. 12, 2009) (three months combined with evidence of "heightened scrutiny" of plaintiff's performance sufficient).

31

    2.    <u>Heartland's response to Woods' complaints.</u>

Because the two to four month period between the time of Woods' complaint and her discharge is too long, standing alone, to establish causation, the Court looks now to see if Woods has come forward with any other evidence to support her claim of causation.  Heartland argues that Woods fails to show causation because she cannot show that management was upset by her complaints.  In support of this argument, Heartland relies on the Michigan Supreme Court's decision in <u>West</u> where it found that plaintiff failed to show causation where his supervisors were "nonchalant" about his police report of alleged assault.  469 Mich. at 187.  By way of contrast, an inference of causation was found to exist in <u>Roulston v. Tendercare, Inc.</u>, 239 Mich. App. 270, 280 (2000) where a supervisor was angry and red in the face and told an employee "you're through" immediately after learning of the employee's protected activity.  Woods alleges that her superiors were upset by her allegations of abuse.  In support of this argument, she relies on her deposition testimony that when she told nurse supervisor Phyllis Maxfield of patient abuse, Maxfield told her that she could not complain to Sheila Goodrich or Renee Hamilton as they would be "pissed."  (Doc. 56, Ex. 2 at 29).  Based on Woods' deposition testimony, an issue of fact exists as to whether Heartland was upset by Woods' complaints of patient abuses.

    3.    <u>Selective Discipline</u>

In addition to alleged temporal proximity and her testimony that her superiors were upset by her complaints, Woods alleges that she was selectively disciplined in retaliation for her complaints.  In support of this argument, she relies on three incidents.  First, she alleges that she was disciplined for showering a resident during the time

period that she should have been handing out breakfast trays in December, 2006.
Second, she was allegedly disciplined for leaving patient alone in the bathroom on
February 5, 2007.  Third, she was allegedly disciplined for placing a dirty food tray on a
clean water cart on April 7, 2007.  The Court addresses each incident in turn.

First, the shower incident occurred in December, 2006, prior to the time period
when Woods alleges that she first started complaining of racial discrimination and
patient abuse.  Thus, the shower incident is not relevant to her retaliation claim here
and does not establish causation.

Second, the court considers the incident where plaintiff was disciplined for
leaving a resident alone in a restroom on February 5, 2007.  Woods claims that she was
disciplined more harshly than other employees for the same conduct.  Woods alleges
that she only left the patient alone in the bathroom because she was violently ill and that
Heartland enforced the rule against her anyway because of her complaints of patient
abuse.  Heartland responds that Renee Hamilton, who presented the discipline, had no
knowledge of plaintiff's complaints until her February 21, 2007 letter.  Hamilton
submitted an affidavit to this effect.  (Doc. 66, Ex. I at 63).  After carefully reviewing
Woods' deposition, it appears that Woods herself is uncertain as to whether she
complained of patient abuse to Renee Hamilton prior to that meeting.  (Doc. 56, Ex. 2 at
44, 59).  For the reasons discussed earlier in this opinion, however, Woods has created
an issue of fact as to whether she was treated more harshly than other CNAs for leaving
a resident alone in the bathroom.  It remains an issue for the jury as to whether
Hamilton knew of Woods' complaints of patient abuse prior to the discipline, and
whether the discipline was in fact retaliatory for those complaints.

33

Finally, the Court considers Woods' claim that she was singled out for discipline for putting a dirty meal tray on a clean water cart because of her complaints of patient abuse.  The watercart incident occurred on April 7, 2007, one day after plaintiff sent a letter to human resources outlining perceived abuses.  Dorothy Jackson, an African American nurse supervisor, corrected Woods for her conduct.  Jackson has submitted an affidavit stating that she had no knowledge of Woods' complaints of racial harassment or patient abuse at the time that she corrected Woods.  (Doc. 66, Ex. CC).  There is no dispute that Woods was not disciplined for placing the dirty tray on the water cart but was disciplined by Darla Hamstreet, the assistant director of nursing, for the way that she treated Jackson.  (Doc. 66, Ex. L).  Hamstreet submitted an affidavit stating that she had no knowledge that Woods had ever complained of patient abuse or neglect.  (Id.).  Woods now complains that she was treated unfairly because Wilson who was present at the water cart incident also was not disciplined for the insubordination.  Heartland has come forward with evidence that Woods' complained to other nurses that Jackson should "mind her own business" but there is no evidence suggesting that Wilson engaged in the same kind of insubordination.  (Doc. 66, Ex. K).  Thus, Woods' and Wilson's situations are distinct and the fact that Woods was disciplined for insubordination while Wilson was not, fails to support Woods' claim of causation.

4.    Discharge

Woods also alleges that her discharge was in retaliation for her complaints of patient neglect and racial harassment.  Because Woods' behavior at the April 16, 2007 meeting is in dispute, Woods has proffered some evidence that her termination was racially driven in support of her prima facie case.

34

5.      Other allegations of causation

Finally, the Court considers Woods' other allegations of causation to satisfy her

prima facie case.  She alleges that Hamilton gave a "veiled threat" that Woods should

quit her job before she was fired.  Heartland responds that Hamilton was not a decision

maker in the decision to terminate Woods and therefore the comment, even if true, is of

no consequence.  Hamilton was, however, interviewed and submitted a witness

statement to the administrator who decided to terminate Woods.  (Doc. 66, Ex. K at 50).

Woods also alleges that Goodrich disconnected a patient alarm to attempt to sabotage

her.  Once again, Heartland argues that even if Woods' allegation is true, Woods was

never falsely accused of disconnecting her patient's alarm and Goodrich played no part

in the decision to terminate Woods.  Goodrich was, however, interviewed and submitted

a witness statement, as part of the investigation by the administrator who decided to

discharge Woods.  (Id).

6.      Bad Faith

Heartland also argues that Woods may not recover under the WPA because she

acted in bad faith.  Under the WPA, a whistleblower must make a report based on her

"desire to inform the public on matters of public concern, and not personal

vindictiveness.'  Shallal v. Catholic Soc Svcs., 455 Mich. 604, 621 (1997).  Woods

responds that she acted with the interests of her co-workers and patients in mind.  This

Court cannot find as a matter of law that Woods acted in bad faith and will not dismiss

the WPA claim on this basis.

Having carefully reviewed all of the evidence presented, this Court must find that

a genuine issue of material facts exists as to whether Woods can show a causal

35

connection between her complaints of patient abuse and neglect and her eventual termination on April 20, 2007.  The time period elapsing between her complaints and her discharge, from at least two months from her first written complaint and four months since her first oral complaint, while insufficient to establish causation standing alone, nevertheless creates an inference that must be supported by other evidence to support a finding of causation.  Woods has come forward with additional evidence to support her claims.  She has raised issues of fact as to whether she was selectively disciplined and whether her conduct at the April 16, 2007 meeting justified termination.  A question of fact remains as to whether her complaints of alleged discrimination and alleged patient abuse were the real cause behind her discharge.

The Sixth Circuit recently addressed a similar situation in Hamilton v. General Elec. Co., __ F.3d __, No. 08-5023, 2009 WL 331260, *6 (6th Cir. Feb. 12, 2009) where the Court found that plaintiff had raised a question of fact as to his claim that his employer terminated him in retaliation for filing an age discrimination complaint based on evidence that he was subjected to increased scrutiny after he filed his EEOC complaint.  The Sixth Circuit found that the heightened scrutiny of plaintiff's work habits, combined with the temporal proximity of three months between the time of the EEOC complaint and his termination were sufficient to establish the causal nexus needed to establish his prima facie case.  Id.  Woods makes a similar argument here that she was subjected to selective discipline soon after complaining of alleged racial discrimination and patient abuse.  Similarly, in Hamilton, the employer's stated reason for terminating the employee was that he refused work directions from his supervisor and "used unacceptable foul and abusive language."  Id. at *3.  The Sixth Circuit found that

36

because plaintiff, during his deposition, denied refusing his supervisor's work order and denied using profanity, that created a genuine issue of material fact as to whether his employer contrived a reason to terminate him to cloak its true, retaliatory motive for firing him.  Id. at *7.   Based on the Sixth Circuit's recent holding in Hamilton, and on her similar deposition testimony that she did not raise her voice, use profanity, pound on the table, or otherwise act in a threatening manner during the April 16, 2007 meeting, Woods has raised a genuine issue of material fact as to whether she can establish the causal nexus needed to establish a prima facie case.

B.      Woods has raised an issue of fact as to whether Heartland's reason for her termination is pretextual.

Heartland argues that even if Woods could state a valid prima facie case under the WPA, ELCRA, or Title VII, her claim would fail for lack of evidence to show that Heartland's reason for terminating her based on her alleged conduct during her April 16, 2007 disciplinary meeting was pretextual.  Once Woods sets our her prima facie case, the burden of production shifts to Heartland to offer a non-discriminatory reason for the adverse employment action.  Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).  If Heartland meets this burden, the burden of production shifts back to Woods to demonstrate that the proffered reason was mere pretext.  Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  To show pretext under Title VII, Woods must show that the proffered reason (1) has no basis in fact, (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action.  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (citations omitted).   In other words, the proffered reason is unworthy of belief.  Reeves

37

2:07-cv-15420-GCS-VMM   Doc # 105   Filed 03/19/09   Pg 38 of 40   Pg ID 3098

v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147-48 (2000).  The pretext analysis under the WPA and ELCRA is similar.  Michigan follows the "pretext plus" requirement which requires a showing that the proffered reason was pretextual and that retaliation was a motivating factor in the decision.  Hazle v. Ford Motor Co., 464 Mich. 456, 464 (2001) (citing Lytle v. Malady, 458 Mich. 153, 176 (1998)).  Similar to Title VII analysis, there are three ways to show pretext under ELCRA, (1) by showing that the reasons proffered by the employer have no basis in fact; (2) if the reasons have a factual basis, that they are not the actual factors that motivated the discharge decision, or (3) if the proffered reasons were factors, that the reasons were nonetheless insufficient to justify discharge.  Dubey v. Stroh Brewery Co., 185 Mich. App. 561, 565-66 (1990).

In this case, Woods argues that the reasons proffered by Heartland are false, or if true, did not warrant dismissal as other employees were allegedly allowed to engage in similar loud and offensive conduct without being terminated.  Woods relies on her own deposition testimony that she laid her head down and cried at the April 16, 2007 meeting and that she never raised her voice.  (Doc. 56, Ex. 2 at 184, 188).  She does, however, admit to saying "bullcrap."  (Doc. 56, Ex.2 at 184).  She also relies on the deposition testimony and statement of Wilson who corroborates her claim that she did not use loud or offensive language, did not pound on the table, and did not threaten anyone.  (Doc. 56, Ex. 13 at 33-34, 36).  Based on this evidence, Woods has raised a genuine issue of material fact as to whether Heartland's stated reason for her discharge was pretext for retaliatory discrimination.  In order to survive summary judgment, Woods must not only show that the proffered reason was pretextual, but that retaliation was the motivating factor in the decision. Woods has raised a genuine issue of material fact as

38

to whether retaliation was the motivating factor based on evidence that she was selectively disciplined, that her supervisors were "pissed" by her complaints, and that Hamilton suggested Woods should quit her job before she was fired.  While this evidence falls well short of the mark to support Woods' own motion for summary judgment on her retaliation claim(s), it is enough to defeat Heartland's motion.

III.    Plaintiff's motion for partial summary judgment

Woods argues that she is entitled to summary judgment on her Title VII retaliation claim because even if she used loud and foul language at the April 16, 2007 meeting, she was complaining of harassment and thus, her conduct was permissible.[2] For the reasons discussed earlier in this opinion, facts remain in dispute as to whether Heartland terminated her in retaliation for her complaints of alleged racial harassment and alleged patient abuse.  Woods is not entitled to summary judgment on the basis of her theory that she could complain of harassment in any manner without fear of reprisal. A litigant is not entitled to a finding of liability under Title VII based merely on the fact that she complained of alleged discrimination and retaliation.  Nor is an employee allowed to scream obscenities at her superiors or to behave in any way that she pleases, even if insubordinate or inappropriate, merely because she alleges harassment.  An employee cannot cloak herself in protected status where her conduct is unreasonable and hostile or aggressive conduct may provide a legitimate and nondiscriminatory basis for an employee's discharge.  See Rollins v. Florida Dep't of

_____

[2]It is unclear if Woods is also seeking summary judgment as to her WPA and ELCRA retaliation claims.  To the extent that she is, her motion for summary judgment as to those claims is also denied for the same reasons discussed above.

Law Enforcement, 868 F.2d 397, 401 (11th Cir. 1989) ("some otherwise protected

conduct may be so disruptive or inappropriate as to fall outside the statute's

protection").  Accordingly, Woods is not entitled to summary judgment on her Title VII

retaliation claim.

CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment as

to the racial discrimination and harassment claims (Doc. 68) hereby is DENIED IN

PART in that the racial discrimination claims survive and hereby is GRANTED IN PART

as to the racial harassment claims which hereby are DISMISSED.

Defendant's motion for summary judgment as to the retaliation claims (Doc. 66)

hereby is DENIED.

Plaintiff's motion for partial summary judgment (Doc. 41) hereby is DENIED.

SO ORDERED.

Dated:  March 19, 2009

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
March 19, 2009, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---